**F I L E D**
United States Court of Appeals
Tenth Circuit

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**MAR 11 1997**

**PATRICK FISHER**
Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee and Cross-Appellant,

v.

DAVID MORALES,

    Defendant-Appellant and Cross-Appellee.

Nos. 95-2069 &
95-2124

---

**Appeal from the United States District Court
for the District of N.M.
(D.C. No. CR-92-486-14-JC)**

---

Charles L. Barth, Assistant United States Attorney (John J. Kelly, United States Attorney, and Laura Fashing, Special Assistant United States Attorney, with him on the briefs), Albuquerque, New Mexico, for Plaintiff-Appellee and Cross-Appellant.

Peter Schoenburg of Rothstein, Donatelli, Hughes, Dahlstrom, Cron & Schoenburg, LLP, Albuquerque, New Mexico, for Defendant-Appellant and Cross-Appellee.

---

Before **BALDOCK** and **BRORBY**, Circuit Judges, and **DANIEL**,[*] District Judge.

---

    [*] The Honorable Wiley Y. Daniel, United States District Judge for the District of Colorado, sitting by designation.

**BRORBY**, Circuit Judge.

A New Mexico federal jury convicted David Morales on one count of conspiracy to possess with intent to distribute controlled substances, and two counts of money laundering. The United States District Court for the District of New Mexico sentenced Mr. Morales to seventy months imprisonment. (Vol. 47 at 127-28.) Mr. Morales appeals his convictions and the United States appeals Mr. Morales' sentence. We exercise jurisdiction over the appeals pursuant to 28 U.S.C. § 1291.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Gabriel Rodriguez-Aguirre ("Mr. Aguirre") managed a family-run organization ("the Aguirre organization") specializing in the sale and distribution of large amounts of marijuana and cocaine. *United States v. Denogean*, 79 F.3d 1010, 1011 (10th Cir.), *cert. denied*, 117 S. Ct. 154 (1996). Between 1984 and 1992, the organization sold more than 20,000 pounds of marijuana and over 20,000 pounds of cocaine to narcotics traffickers in New Mexico, Arizona, Utah, Kansas, Massachusetts, and elsewhere throughout the United States. *Id.* The organization used narcotics proceeds to purchase real property and other assets. *Id*.

Mr. Morales' wife is the niece of Mr. Aguirre. Evidence at trial showed Mr. Morales was involved in the Aguirre organization as a money launderer. The government's evidence revealed Mr. Morales purchased a number of horses and trucks with drug proceeds. It also showed Mr. Morales purchased a bar, the E & J Lounge, with drug profits. In total, the trial court determined Mr. Morales was involved in the laundering of drug proceeds in the amount of $831,514.37.

In October 1992, a federal grand jury in the District of New Mexico returned a twenty-three count indictment against Mr. Morales and twenty-one other defendants, including Mr. Aguirre. The bill of indictment charged Mr. Morales with conspiracy to distribute marijuana and two counts of money laundering. Mr. Morales pled not guilty to the charges against him, and proceeded to trial with his co-defendants in January 1994.

The original trial of Mr. Morales and his co-defendants lasted six months, becoming "the longest federal criminal trial ever held in the district of New Mexico." *United States v. Rodriguez-Aguirre*, 73 F.3d 1023, 1024 (10th Cir. 1996). After deliberating for more than six weeks, the jury was unable to reach a verdict on the majority of counts, including all counts against Mr. Morales. Consequently, the trial judge declared a mistrial. *Id.*

In August 1994, the United States obtained a superseding indictment against Mr. Morales and nine of his co-defendants. The superseding indictment increased the charges against Mr. Morales. The superseding indictment charged Mr. Morales with investment of illicit drug profits, conspiracy to possess with the intent to distribute cocaine and marijuana, conspiracy to distribute cocaine and marijuana, and two counts of money laundering. Although Mr. Morales moved to dismiss the superseding indictment on the grounds of prosecutorial vindictiveness, the district court summarily denied his motion.

Mr. Morales also filed a motion for severance pursuant to Fed. R. Crim. P. 14. Mr. Morales argued a joint trial would cause him prejudice because the weight of the evidence against his co-defendants was much greater than the weight of the evidence against Mr. Morales. Notwithstanding his contentions, the district court denied Mr. Morales' motion for severance.

The United States tried Mr. Morales and his co-defendants on the superseding indictment in November and December of 1994. Prior to trial, the court selected a jury panel of approximately 250 jurors from voter registration lists for the Roswell Division of the District of New Mexico. The district judge excused 132 jurors *sua sponte* after reviewing the juror questionnaires; the court

only directed 115 jurors to report for jury service. Six days prior to trial, defense counsel were provided copies of juror questionnaires for the panel that had been selected for service, and defense counsel learned the court had excused the remaining jurors.

On the first day of trial, prior to jury selection, Mr. Aguirre filed a motion to stay the proceedings, and Mr. Morales filed a motion to quash the jury venire.[1] The motions alleged the jury venire panel seriously misrepresented the ethnic makeup of the District of New Mexico. Specifically, the defendants claimed persons of Hispanic origin and American Indian background were underrepresented. The defendants sought a stay of the trial to allow time for an investigation of the ethnic background of all the jurors. In addition, Mr. Morales' counsel, Paul Kennedy, advised the court orally of *United States v. Calabrese*, 942 F.2d 218 (3d Cir. 1991), which Mr. Kennedy claimed stood for the proposition that it is reversible error for a court to exclude a juror prior to voir dire "simply because a juror knows a defendant." Mr. Kennedy claimed it appeared the court had excused at least one juror because the juror stated that he

---

[1] Pursuant to the court's order that "one motion made by one defense counsel applies to all [defendants] unless specifically excluded by that defendant," all of the defendants adopted the motions of Mr. Aguirre and Mr. Morales.

or she knew one of the defendants.

Following Mr. Kennedy's comments, the court held an evidentiary hearing at which Nancy Metzger, jury administrator for the Federal Court Clerk's office, testified. Ms. Metzger stated the jury panel of approximately 250 jurors had been selected randomly from voter registration lists. Ms. Metzger testified that the district judge reviewed the juror questionnaires and directed her to excuse more than 100 specific jurors. Ms. Metzger stated she did not know the ethnicity of either the excused jurors or the jurors who reported for service.

The court then stated it had reviewed the individual juror questionnaires and "retained the stack of those who, for some reason or other, claimed that they couldn't serve." The court explained:

> I think it goes without saying that the ones that were not summoned, I never looked at the last name, whether it was [a] Hispanic surname or whether it was not a Hispanic surname, or whether they were American Indians or not. As a matter of fact, I'm not real sure that that's part of the questionnaire --

Ms. Metzger confirmed the questionnaire forms did not direct the jurors to list their ethnicity.

The district court denied the defendants' motion to stay the proceedings and

the defendants' motion to quash the jury venire. However, the court allowed the defendants to supplement the record within ten days of the completion of the trial with information concerning the racial composition of the District of New Mexico and the Roswell Division. None of the defendants chose to supplement the record with such information.

The trial of Mr. Morales and his co-defendants lasted approximately one month. On December 15, 1994, the jury returned a verdict against Mr. Morales on one count of conspiracy and two counts of money laundering. The jury did not reach a verdict on the investment of illicit drug profits count, and the district court declared a mistrial as to that count.

Thereafter, Ms. Sonia Gallegos, one of Mr. Morales' co-defendants who was also convicted, filed a motion for a new trial, arguing, *inter alia*, she was entitled to a new trial because of jury misconduct.[2] Mr. Morales adopted Ms. Gallegos' motion for a new trial pursuant to the district court's standing order that "anything that anybody files the others adopt." Mr. Morales attached an affidavit

---

[2] Although Mr. Morales also filed a motion for a new trial based on jury misconduct, his motion is not included in the record. Thus, we must focus on the allegations raised by Ms. Gallegos in her motion for a new trial.

from defense investigator Kelly Owens to his motion. Mr. Owens testified that following the trial, he questioned nine of the twelve jurors who convicted Mr. Morales. Mr. Owens stated that one of the jurors, Linda Howard, admitted looking up the dictionary definition of the word "distribution" on the first day of deliberations and sharing its definition with the other jurors on the following day. According to Mr. Owens, Ms. Howard stated the jurors discussed the meaning of "distribution" as it related to the guilt or innocence of Ms. Gallegos. Mr. Owens also testified juror Ronnie Warmuth claimed he had knowledge of another juror researching the dictionary definition of the word "hypothecate."[3] In his post-trial motion, Mr. Morales contended this improper juror conduct prejudiced him and entitled him to a new trial.

---

[3] The United States attached affidavits from jurors Ronnie Warmuth and Kerry Romine to the United States' response to Ms. Gallegos' motion for a new trial. Mr. Warmuth stated:

> On further reflection, I do not believe that a dictionary was used at all. The only definition which was questioned regarded the word "pontificate" as used by the witness John Henry Lee. Mr. Kerry Romine, a fellow juror, knew the definition of this word and no dictionary was consulted.

Similarly, Mr. Romine testified that although a question arose during deliberations as to the definition of the word "pontificate," "the jury did not at any time consult a dictionary."

The district court denied Mr. Morales' motion for a new trial, rejecting the defendants' claim of jury misconduct. The court concluded the word distribution was one of common usage, and there was no showing any of the jurors relied upon its dictionary definition or that it "made any difference at all in the jury deliberations."

At sentencing, the district court adopted the factual findings and sentencing guideline application in Mr. Morales' presentence report. The court concluded Mr. Morales' guideline range should be calculated pursuant to his involvement in money laundering, rather than pursuant to his conviction of conspiracy, because his offense conduct did not "establish a quantity of narcotics reasonably foreseeable to [Mr. Morales]." Thus, the court found Mr. Morales' guideline range to be seventy to eighty-seven months, and sentenced him to a term of seventy months imprisonment.

## II. ISSUES RAISED ON APPEAL

Mr. Morales raises the following issues on appeal: (1) whether the district court violated Mr. Morales' rights under the Constitution or the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861-1878 (1994), by excluding more than half of the original jury panel *sua sponte* prior to *voir dire*; (2) whether the district

court violated Mr. Morales' Fifth and Sixth Amendment rights by failing to grant his motion for severance; (3) whether the district court should have dismissed the superseding indictment on the basis of prosecutorial vindictiveness; (4) whether the evidence was sufficient to support Mr. Morales' conviction on count XII, money laundering; and (5) whether the district court should have granted Mr. Morales a new trial based on the jury's misconduct in researching the definition of "distribution." The United States raises one issue in its cross appeal: whether the district court erred in failing to sentence Mr. Morales to the mandatory minimum sentence of ten years imprisonment for his conviction of conspiracy to distribute controlled substances. Mr. Morales has filed a motion to dismiss the United States' appeal, arguing the appeal should be dismissed because it is facially inadequate and untimely.

## III. ANALYSIS

### A. Mr. Morales' Appeal

#### 1. Jury Selection

Mr. Morales argues the district court's excusal of over half the original jury panel, off the record and outside the presence of the defendants and counsel, violated the Jury Selection and Service Act, as well as Mr. Morales' Fifth and Sixth Amendment rights. 28 U.S.C. § 1867(d) requires all motions challenging

compliance with the Jury Selection and Service Act to be accompanied by a "sworn statement of facts which, if true, would constitute a substantial failure to comply with the [Jury Selection and Service Act]." In the recent appeal of Mr. Morales' co-defendant Doloras Contreras, we determined Ms. Contreras' claim under the Jury Selection and Service Act was barred by the defendants' failure to accompany their motions challenging the district court's jury selection procedures with an adequate sworn statement as required by 28 U.S.C. § 1867(d). *United States v. Contreras*, __ F.3d ___ (10th Cir. Mar. 11, 1997). Here, as in *Contreras*, Mr. Morales failed to file a sworn affidavit in support of his motion challenging the district court's jury selection procedures. Consequently, Mr. Morales' Jury Selection and Service Act claim is barred.

Also in *Contreras*, we denied Ms. Contreras' Fifth and Sixth Amendment challenges to the jury selection procedures. *See id.* at ___. We determined Ms. Contreras could not establish a *prima facie* case of a fair cross section violation or an equal protection violation, and we concluded Ms. Contreras' Sixth Amendment impartial jury claim was without merit. *Id.* For the reasons stated in *Contreras*, we likewise find no merit in Mr. Morales' constitutional challenges to

the district court's jury selection procedures.[4]

## 2. Severance

Mr. Morales argues the district court violated his Fifth and Sixth Amendment rights to due process and a fair trial by denying his motion for severance and forcing him to trial with "[five] co-defendants against whom the [United States] had overwhelming evidence." Mr. Morales alleges the government had substantially less incriminating evidence against him than it had against his co-defendants. According to Mr. Morales, the overwhelming evidence the government introduced at trial against his co-defendants resulted in a spillover effect, which led to Mr. Morales' convictions.

A decision to grant or deny severance is within the sound discretion of the trial court and will not be disturbed on appeal unless there is an affirmative showing of abuse of discretion. *United States v. Sanders*, 929 F.2d 1466, 1469 (10th Cir.), *cert. denied*, 502 U.S. 846 (1991). To establish an abuse of discretion, the defendant must show actual prejudice resulted from the denial. *Id.*

---

[4] In *Contreras*, we also determined the district court did not violate Fed. R. Crim. P. 43 or 28 U.S.C. § 753(b) (1994) by failing to dismiss the 132 jurors in open court and in the presence of the defendants. *See id.* at ___. To the extent Mr. Morales asserts claims under Rule 43 or 28 U.S.C. § 753(b), these claims are rejected pursuant to our reasoning in *Contreras*.

Furthermore,

> "[i]n deciding on a motion for severance, the district court has a duty to weigh the prejudice resulting from a joint trial of co-defendants against the expense and inconvenience of separate trials ....  Neither a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the "spillover effect" from the evidence that was overwhelming or more damaging against the co-defendant than that against the moving party is sufficient to warrant severance."

*United States v. Cardall*, 885 F.2d 656, 668 (10th Cir. 1989) (quoting *United States v. Hack*, 782 F.2d 862, 870 (10th Cir.), *cert. denied*, 476 U.S. 1184 (1986)).

We note as an initial matter that Mr. Morales was properly joined for trial pursuant to Fed. R. Crim. P. 8(b).  Rule 8(b) permits the joinder of two or more defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Rule 8 is construed broadly to allow liberal joinder to enhance the efficiency of the judicial system.  *United States v. Hopkinson*, 631 F.2d 665, 668 (1980), *cert. denied*, 450 U.S. 969 (1981).  The evidence at trial revealed Mr. Morales was involved with his co-defendants in a common scheme or plan to launder illegally derived drug proceeds.  Thus, the joinder of Mr. Morales was proper and in accordance with Rule 8(b).

Under Fed. R. Crim P. 14, the district court may grant a severance of defendants if it appears joinder results in a prejudice to a defendant. In *Zafiro v. United States*, 506 U.S. 534, 539 (1993), the Supreme Court explained that:

> a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened. Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice.

Rule 14 leaves the determination of risk of prejudice and any remedy for such prejudice to the sound discretion of the district court. *Id.* at 541.

Having thoroughly examined Mr. Morales' arguments, we do not believe the district court abused its discretion in denying Mr. Morales' motion to sever. The evidence at trial revealed Mr. Morales was involved with co-defendants Gabriel Aguirre and Doloras Contreras in the purchase of race horses with illegally derived proceeds. Evidence also established Mr. Morales, Mr. Aguirre, and co-defendant Eleno Aguirre purchased the E & J Lounge with illicit funds. Thus, the evidence against Mr. Morales and his co-defendants was overlapping and

intertwined.

Although the joinder of Mr. Morales may have resulted in the admission of some evidence that would not have been admitted if the court tried Mr. Morales alone, we do not find the district court's denial of severance caused Mr. Morales unfair prejudice. The fact that the jury was unable to reach a verdict as to Mr. Morales on the illicit investment count shows the jury carefully evaluated the evidence presented as to each defendant and each count. In denying Mr. Morales' motion to sever, the district court appropriately determined considerations of judicial economy and expediency outweighed the potential prejudice to Mr. Morales. Given the considerable discretion afforded the district court under Rule 14, we cannot say it abused its discretion.

### 3. Vindictive Prosecution

Mr. Morales contends the district court should have dismissed the superseding indictment because of prosecutorial vindictiveness. The United States increased the charges against Mr. Morales in the superseding indictment filed after the mistrial. Mr. Morales asserts the United States was aware of the information giving rise to the increased charges prior to his first trial. Given this prior knowledge, along with the negative publicity the United States suffered

following the mistrial, Mr. Morales contends there is a reasonable likelihood the increased charges were motivated by prosecutorial vindictiveness.

In *Contreras*, we decided a virtually identical vindictive prosecution claim asserted by Ms. Contreras. __ F.3d at ___. Looking to the totality of the circumstances, we determined there was no reasonable likelihood the increased charges against Ms. Contreras stemmed from prosecutorial vindictiveness. *Id.* at ___. In the present case, based upon our reasoning in *Contreras*, we likewise conclude there is no reasonable likelihood the enhanced charges against Mr. Morales were motivated by prosecutorial vindictiveness.[5]

---

[5] Unlike Ms. Contreras, Mr. Morales alleges he rejected a number of plea offers from the United States prior to the filing of the superseding indictment. Mr. Morales ostensibly contends this is another factor establishing a reasonable likelihood of vindictiveness. Assuming Mr. Morales' allegations are true, we are not persuaded by his argument.

The Second Circuit denied an almost identical claim of vindictive prosecution in *United States v. Khan*, 787 F.2d 28 (2d Cir. 1986). In *Kahn*, as in the present case, the first trial of the defendant resulted in a mistrial caused by a hung jury. *Id.* at 30. Neither the United States nor the defendant objected to the mistrial. *Id.* at 33. Thereafter, the United States initiated plea discussions with counsel for the defendant. *Id.* at 30. When the defendant refused to enter into a plea agreement, however, the United States obtained a superseding indictment that added charges against the defendant. *Id.* The defendant was tried on the superseding indictment and found guilty on each count. *Id.*

On appeal, the defendant argued a presumption of prosecutorial vindictiveness arose from the addition of new counts following the defendant's rejection of a plea offer and assertion of his right to a jury trial. *Id.* at 30-31.

## 4. Sufficiency of the Evidence

Next, Mr. Morales asserts the evidence at trial was insufficient to support his conviction on Count XII, money laundering. In reviewing the sufficiency of the evidence in a criminal case, "'[t]he evidence -- both direct and circumstantial, together with reasonable inferences to be drawn therefrom -- is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.'" *Sanders*, 929 F.2d at 1470 (quoting *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), *cert. denied*, 475 U.S. 1128 (1986)). The evidence presented to support a conviction must be substantial; "it must do more than raise a mere suspicion of guilt." *Sanders*, 929 F.2d at 1470 (internal quotation marks omitted).

---

The Second Circuit disagreed, concluding the defendant did nothing likely to inspire the wrath of the United States. *Id.* at 33. In discussing the defendant's claim, the court noted "in the 'give-and-take' of plea bargaining there is no element of retaliation so long as a defendant remains free to accept or reject the offer." *Id.* at 31 (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)). Consequently, the court held it was "unrealistic to assume that the government's probable response to a defendant's choice to exercise his fundamental right to a trial would be to seek to penalize and deter, even if that choice follows on the heels of a mistrial." *Id.* at 33.

We agree with the Second Circuit. Notwithstanding Mr. Morales' rejection of the United States' plea offers, we do not believe Mr. Morales engaged in any conduct that was reasonably likely to "inspire the wrath of the prosecutor." *See id.* Thus, Mr. Morales cannot prevail on his vindictive prosecution claim.

The jury in this case convicted Mr. Morales of violating 18 U.S.C. § 1956(a)(1)(B)(ii) (Supp. 1996) and 18 U.S.C. § 2 (1994) by participating in the purchase of the E & J Lounge.  The jury determined Mr. Morales and two co-defendants (Eleno and Gabriel Aguirre) purchased the lounge with fifty payments, each in an amount less than $10,000.00, and each designed to avoid a federal transaction reporting requirement.  To obtain a conviction under 18 U.S.C. § 1956(a)(1)(B)(ii),[6] the government must prove the following four elements beyond a reasonable doubt:

> (1) the defendant willfully conducted or caused to be conducted a financial transaction;
>
> (2) the defendant knew at the time of the financial transaction that the money represented proceeds of some unlawful activity;
>
> (3) the money involved was in fact the proceeds of specified unlawful activity; and
>
> (4) the defendant knew at the time that the transaction was designed in whole or in part to avoid a transaction reporting requirement under federal law.

On appeal, Mr. Morales contends the United States failed to establish

---

[6]  As noted, the government also charged Mr. Morales with violating 18 U.S.C. § 2.  This statute provides:  "Whoever commits an offense against the United States or aids [or] abets ... its commission, is punishable as a principal."  This statute is not relevant for our analysis on the sufficiency of the evidence issued.

beyond a reasonable doubt the first element of this statute -- that he willfully conducted or caused to be conducted a financial transaction. According to Mr. Morales, there is no evidence in the record to support the inference that Mr. Morales was involved in any of the fifty payments made in connection with the purchase of the E & J Lounge.

Our review of the record reveals Mr. Edward Lopez testified he entered into an agreement to sell the E & J Lounge to Mr. Morales, Gabriel Aguirre, and Eleno Aguirre for $434,000.00. The agreement to purchase, the commercial lease, and the warranty deed were all signed by Mr. Morales.

The purchase of the E & J Lounge was effectuated through payments made directly to the law offices of Lloyd Bates, Mr. Lopez's attorney. Ms. Patricia Alvillar, Mr. Bates' secretary, testified that she issued a number of receipts for payments made to David Morales. Although none of the employees of Mr. Bates' law office could identify Mr. Morales as having made any of the payments, at least one of the payments to the Bates law firm was made with a cashier's check issued by Silver Savings and Loan, listing David Morales as the remitter. Ms. Shirley Madrid, who issued the cashier's check on behalf of Silver Savings and Loan, testified she knew Mr. Morales and his wife, and she would not have

allowed anyone other than Mr. Morales or his wife to purchase the check.

Finally, the record reveals FBI Special Agent Sam Macaluso testified at trial concerning a post-arrest statement made by Mr. Morales. Special Agent Macaluso testified that Mr. Morales stated he was the owner of the E & J Lounge and he believed a down payment on the bar was made with "the proceeds of drug activity." Although Mr. Morales contends the testimony of Agent Macaluso was "contrary to all of the other evidence in the case" and given with "little confidence" by the agent,"'we may neither weigh conflicting evidence nor consider the credibility of witnesses.'" *United States v. Harrod*, 981 F.2d 1171, 1174-75 (10th Cir. 1992) (quoting *United States v. Darrell*, 828 F.2d 644, 647 (10th Cir. 1987)), *cert. denied*, 508 U.S. 913 (1993); *United States v. Torres*, 53 F.3d 1129, 1134 (10th Cir.), *cert. denied*, 115 S. Ct. 2599, and 116 S. Ct. 220 (1995). Such assessments are within the exclusive province of the jury. *United States v. Davis*, 965 F.2d 804, 811 (10th Cir. 1992), *cert. denied*, 507 U.S. 910 (1993). In our view, looking at the entire evidence in the light most favorable to the government, a reasonable jury could have concluded beyond a reasonable doubt that Mr. Morales willfully conducted at least one of the fifty financial transactions specified in Count XII of the superseding indictment.

**5. Jury Misconduct**

Finally, Mr. Morales contends the district court erred in failing to grant a new trial based upon the jury's misconduct in using a dictionary to look up the definition of the word "distribution."  In the recent appeal of Mr. Morales' co-defendant, Eleno Aguirre, we determined a presumption of prejudice arose from the jury's improper conduct in researching the dictionary definition of distribution.  *United States v. Aguirre*, __ F.3d ___ (10th Cir. Mar. 11, 1997).  Nevertheless, because there was no evidence any of the jurors relied upon or attached any significance to the dictionary definition, we concluded the jury's misconduct was harmless beyond a reasonable doubt to Mr. Aguirre.  *Id.* at ___.  Based on our reasoning in *Aguirre*, we likewise conclude the jury's misconduct in researching the dictionary definition of distribution was harmless  to Mr. Morales beyond a reasonable doubt.

**B.  United States' Appeal**

The United States contends the district court erred in failing to sentence Mr. Morales to the mandatory minimum term of ten years imprisonment for his conviction.  Mr. Morales claims the United States' appeal must be dismissed because it is facially inadequate and untimely.  We first review Mr. Morales' motion to dismiss to determine whether we have jurisdiction to entertain the

government's appeal.

### 1. Motion to Dismiss

Mr. Morales claims the United States' appeal should be dismissed for either of two reasons: (1) the notice of appeal failed to give proper notice of from what order the government's appeal was taken, or (2) the notice of appeal was untimely. First, Mr. Morales contends the government's notice of appeal is invalid because the notice fails to state the United States is appealing the sentence of Mr. Morales. Fed. R. App. P. 3(c) requires a notice of appeal to "designate the judgment, order, or part thereof appealed from." Here, although the United States seeks to appeal the sentence entered against Mr. Morales, the United States' notice of appeal provides that it appeals from "an Order entered by the District Court on May 19, 1995 which denied Motion for Judgment of Acquittal; Motion for New Trial Based Upon Jury Misconduct; Motion to Continue Bail Pending Appeal by David Morales." Because the notice of appeal does not indicate the United States intends to appeal the sentence of Mr. Morales, the government failed to comply with Fed. R. App. P. 3(c).

Nevertheless, our inquiry does not stop here. The Supreme Court has stated that "the requirements of the rules of procedure should be liberally construed and

that 'mere technicalities' should not stand in the way of consideration of a case on its merits." *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 316 (1988). We have applied this principle of liberal construction in situations where a party has misdesignated the order appealed from in a notice of appeal. For example, in the notice of appeal in *Wright v. American Home Assurance Co.*, 488 F.2d 361, 363 (10th Cir. 1973), the appellant improperly designated a non-appealable order as the order being appealed. Nevertheless, we determined that:

> incomplete compliance with F[ed]. R. App. P. 3(c) should not result in the loss of an intended appeal on the merits. Appellant's intention to seek review of the judgment is manifest. Both appellant and appellee briefed the merits, and the appellant's statement of issues similarly demonstrates an intent to challenge the judgment. It would be contrary to the spirit of the Federal Rules of Civil Procedure to deny appellant a decision on the merits because of a mere technicality.

*Id.* (citations omitted). We therefore considered the merits of the case as an intended appeal from the final judgment. *Id.*

Similarly, in *Cooper v. American Auto. Ins. Co.*, 978 F.2d 602, 607-09 (10th Cir. 1992), we held an order granting the government's motion to dismiss was appealable even though the appellant's notice of appeal failed to designate that order. Importantly, we found the supporting papers filed with the notice of appeal, including the docketing statement, indicated the appellant was appealing the order of dismissal. *Id.* Because the government was not misled or prejudiced

by the inclusion of the dismissal issue on appeal, we allowed the appeal of that issue to proceed. *Id.* at 609.

Notwithstanding the wording of the notice of appeal in the present case, we are confident the notice was sufficient to inform Mr. Morales that the government sought to appeal his sentence. As Mr. Morales states in his brief in support of his motion to dismiss, the government "obviously" has no basis to appeal the court's order of May 19, 1995. That order was favorable to the government. Because Mr. Morales was convicted on three counts, and the trial court declared a mistrial without objection on the remaining count, the only issue the government could be appealing is Mr. Morales' sentence.

Moreover, as in *Cooper,* the supporting papers filed in connection with the government's notice of appeal indicate the government seeks to appeal Mr. Morales' sentence. The docketing statement unambiguously states the issue raised on appeal as follows: "whether the trial court's failure to apply the statutory minimum sentence under 21 U.S.C. [§] 841(b)(1)(A) constituted error." Like the appellees in *Cooper* and *Wright*, Mr. Morales was neither misled nor prejudiced by the government's notice of appeal. Under these circumstances, "incomplete compliance with F[ed]. R. App. P. 3(c) should not result in the loss of an intended

appeal on the merits." *See Wright*, 488 F.2d at 363. We therefore refuse to dismiss the government's appeal on the basis of its failure to strictly comply with Rule 3(c).

Second, Mr. Morales contends the government's appeal should be dismissed because the government did not file its notice of appeal in a timely manner. Fed. R. App. P. 4(b) requires an appeal by the government in a criminal case to be filed in the district court "within 30 days after (i) the entry of the judgment or order appealed from or (ii) the filing of a notice of appeal by any defendant."

The government claims it filed its June 19, 1995 notice of appeal within thirty days of Mr. Morales' notice of appeal. Although the record indicates Mr. Morales filed his notice of appeal on April 10, 1995, we must look to Fed. R. App. P. 4(b) to determine the date on which Mr. Morales' appeal became effective. Under Rule 4(b), "[a] notice of appeal filed after the court announces a decision, sentence, or order but before it disposes of [a timely motion for judgment of acquittal or a motion for a new trial] is ineffective until the date of the entry of the order disposing of the last such motion outstanding."

Here, Mr. Morales filed a motion for judgment of acquittal and a motion for

a new trial on January 13, 1995.[7]  The district court denied these motions on May 19, 1995.  Thus, if Mr. Morales filed his motion for judgment of acquittal and motion for a new trial in a timely manner, Mr. Morales' appeal did not become effective until May 19, 1995.

We must therefore determine whether Mr. Morales timely filed his motions for judgment of acquittal and for a new trial.  A defendant may filed a motion for judgment of acquittal within seven days after the jury is discharged or within such further time as determined by the court within the seven-day period.  *See* Fed. R. Crim. P. 29(c).  A motion for a new trial "shall be made" within this same time period.  *See* Fed. R. Crim. P. 33.  Intermediate Saturdays, Sundays, and legal holidays are excluded from the calculation.  *See* Fed. R. Crim. P. 45(a).  In the present case, the jury returned its verdict against Mr. Morales on Thursday, December 15, 1994.  On December 22, 1994, Mr. Morales filed a motion for extension of time in which to file motions for judgment of acquittal and for a new trial.  On December 27, 1994, the district court granted co-defendant Sonia Gallegos' similar motion for extension of time, giving Ms. Gallegos until January

---

[7]  Mr. Morales adopted Ms. Gallegos' motion for a new trial pursuant to the court's "standing order."  *See supra* notes 1 & 2.

-26-

13, 1995, to file post-trial motions.[8]  The court never ruled upon Mr. Morales'

motion for an extension of time.  Nevertheless, on January 13, 1995, Mr. Morales

filed his motions for judgment of acquittal and for a new trial.  The court denied

Mr. Morales' motions on May 19, 1995.

Because the district court never ruled upon Mr. Morales' motion for an

extension of time, the timeliness of Mr. Morales' motions for judgment of

acquittal and for a new trial are at issue.  If the court's failure to rule upon the

motion was the result of a clerical mistake, then we will deem Mr. Morales'

motions for judgment of acquittal and for a new trial to have been timely filed.

Under Fed. R. Crim. P. 36, "errors in the record arising from oversight or

omission may be corrected by the court at any time and after such notice, if any,

as the court orders."  A clerical mistake is not necessarily limited to an error

committed by a clerk.  *United States v. Sides*, 1994 WL 38640, at *2 (10th Cir.

1994) (unpublished decision) (citing *Pattiz v. Schwartz*, 386 F.2d 300, 303 (8th

Cir. 1968)).

---

[8]  The district court's order granting Ms. Gallegos' motion for an extension
of time was filed within the seven-day period provided for in Rules 33 and 45(a).
*See* Fed. R. Crim. P. 45(a) (intermediate Saturdays, Sundays, and legal holidays
excluded from calculation).

On January 22, 1996, we partially remanded this case to the district court for the limited purpose of determining whether the failure to rule on Mr. Morales' motion for an extension of time was a "clerical error," and, if so, to correct that error. *United States v. Morales*, No. 95-2069 (10th Cir. Jan. 22, 1996) (order partially remanding action). On remand, the district judge found "the motion for extension of time was not presented to him for consideration." *United States v. Morales*, No. 92-486 (D.N.M. Jan. 30, 1996) (order holding no clerical error). The court never received a "courtesy copy" of the motion or a facsimile copy. *Id.* Consequently, the district court concluded no clerical error occurred. *Id.*

Notwithstanding the district court's findings, we believe the court's failure to rule on the motion for an extension of time was, in fact, the result of a clerical mistake. As stated, a clerical mistake is an error in the record "arising from oversight or omission." Fed. R. Crim. P. 36. In *Pattiz*, the Eighth Circuit examined the meaning of "clerical mistake" under Fed. R. Civ. P. 60(a). 386 F.2d at 303. The district judge in *Pattiz* received the plaintiff's amended complaint, but placed it in the court file without ever filing the document. *Id.* at 301. In subsequent litigation, whether the amended complaint was filed became an issue. *Id.* at 302. The district court determined a clerical error had been made under Rule 60(a) and ordered that the record be corrected to show the filing of the

amended complaint. *Id.* The Eighth Circuit agreed, concluding Rule 60(a) encompasses such things as "'misprisions, oversights and omissions, unintended acts or failures to act.'" *Id.* at 303 (quoting 6A Moore's Federal Practice ¶ 60.06(1), p. 4042 (2d ed. 1966)).

The present case presents the converse of *Pattiz.* In *Pattiz*, the district judge received the document but the clerk never docketed it. Here, the clerk entered the document on the docket, but the district judge never received the document. Neither of the parties in this case are responsible for the mistake. Obviously, the error stemmed from an oversight on the part of the clerk. Consequently, we conclude a clerical mistake occurred within the meaning of Fed. R. Crim P. 36.

Ordinarily, we would remand a case involving a clerical mistake to the district court for correction. *See* Fed. R. Crim. P. 36. However, such a remand would serve no useful purpose in the present case. It would merely waste valuable judicial time and resources. We conclude that if no clerical error had occurred in the case at bar, the district court would have granted Mr. Morales' motion for an extension of time on the same day the court granted Ms. Gallegos' motion for an extension of time. There is nothing in the record to indicate Mr.

Morales' motion would have received any less favorable treatment than the motion filed by Ms. Gallegos. Because Mr. Morales filed his motion for judgment of acquittal and motion for a new trial within the time allotted Ms. Gallegos, we conclude Mr. Morales' motions were timely filed.[9]

Having determined Mr. Morales filed his motions in a timely manner, it follows Mr. Morales' notice of appeal did not become effective until May 19, 1995, the date the court denied Mr. Morales' post-trial motions. *See* Fed. R. App. P. 4(b). Because the government filed its notice of appeal on June 19, 1995, it did so within thirty days of Mr. Morales' appeal and in compliance with Rule 4(b).[10] We therefore deny Mr. Morales' motion to dismiss the government's appeal.

---

[9] Even if the court's failure to rule on Mr. Morales' motion was not the result of a clerical error, we would still find Mr. Morales' post-trial motions to be timely filed. The district court issued a standing order in this case that any motion filed by one defendant was adopted by the other defendants. Thus, Mr. Morales adopted Ms. Gallegos' motion for an extension of time to file a motion for a judgment of acquittal and a motion for a new trial under the court's standing order. In granting Ms. Gallegos' motion for an extension of time, we believe the trial court implicitly granted an extension of time to Mr. Morales, as well.

[10] The thirtieth day from the date Mr. Morales' appeal became effective was June 18, 1995. However, because June 18 was a Sunday, it does not count for computation of time purposes. *See* Fed. R. App. P. 26(a) (last day of time period not included if it is a Saturday, Sunday, or legal holiday). Hence, the government filed its appeal on time.

## 2. Mr. Morales' Sentence

The United States contends the district court erred in sentencing Mr. Morales pursuant to the money laundering guideline range. The United States argues 21 U.S.C. §§ 841(b)(1)(A) and 846 (1994) required the court to sentence Mr. Morales to the mandatory minimum sentence of ten years in prison for his conviction of conspiracy.

In general, "district courts have broad discretion in sentencing a defendant within the range prescribed by Congress." *United States v. Robertson*, 45 F.3d 1423, 1448 (10th Cir.), *cert. denied*, 115 S. Ct. 2258 and 116 S. Ct. 133 (1995). "'"[I]t is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence."'" *Koon v. United States*, 116 S. Ct. 2035, 2046 (1996) (quoting *Williams v. United States*, 503 U.S. 193, 205 (1992)). Although we review the district court's application of the sentencing guidelines *de novo*, we review the sentencing court's factual findings under a clearly erroneous standard. *Robertson,* 45 F.3d at 1444. Thus, a sentencing court's determination of the quantity of drugs attributable to a defendant is reviewed for clear error. *Torres*, 53 F.3d at 1144.

> To constitute clear error, we must be convinced that the sentencing court's finding is simply not plausible or permissible in light of the

> entire record on appeal, remembering that we are not free to substitute our judgment for that of the district judge.

*Id.* (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).

21 U.S.C. §§ 841(b)(1)(A) and 846 provide for a mandatory minimum sentence of ten years for any defendant convicted of a conspiracy to distribute at least five kilograms of cocaine or at least 1,000 kilograms of marijuana. Under U.S.S.G. § 1B1.3(a), relevant conduct for sentencing purposes is assessed on the basis of:

> (1) (A)  all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B)  in the case of a jointly undertaken criminal activity ..., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity ....

U.S.S.G. § 1B1.3(a) (1995). In the case of controlled substances, a defendant is "accountable for all quantities of contraband with which he was *directly involved* and, in the case of a jointly undertaken criminal activity, all *reasonably foreseeable* quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3 comment. (n.2) (emphasis added). The government must prove, by a preponderance of the evidence, the amount of drugs attributable to each defendant. *Torres*, 53 F.3d at 1144.

In the instant case, the trial court determined Mr. Morales was involved in the laundering of drug profits in the amount of $831,514.37. However, the court determined the mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A) was inapplicable to Mr. Morales because his conduct did not establish a "quantity of narcotics reasonably foreseeable" to him. Hence, the court sentenced Mr. Morales pursuant to his involvement in money-laundering.

The government argues the trial court erred in two respects. First, the government contends the court erroneously applied the "reasonably foreseeable standard" to Mr. Morales, even though Mr. Morales "personally laundered drug profits generated from selling quantities of cocaine well in excess of the five kilograms necessary to invoke the mandatory minimum sentence." (Emphasis omitted.) Second, the government claims the court erred in determining Mr. Morales' conduct did not establish at least five kilograms of cocaine were reasonably foreseeable to him. We address the government's contentions in turn.

We interpret the United States' first argument to be that the trial court erred by failing to determine under U.S.S.G. § 1B1.3(a)(1)(A) that Mr. Morales was

directly involved with at least five kilograms of cocaine.[11]  As stated, a defendant

"'is accountable for all quantities of contraband with which he was directly

involved.'"  *United States v. Lockhart*, 37 F.3d 1451, 1454 (10th Cir. 1994)

(quoting U.S.S.G. § 1B1.3, comment. (n.2)).  Where the sentencing court

determines a defendant was directly involved in the distribution of a quantity of

drugs sufficient to invoke a mandatory minimum sentence under 21 U.S.C.

§ 841(b)(1)(A), the quantity of drugs reasonably foreseeable to the defendant is

irrelevant.  *Lockhart*, 37 F.3d at 1454 (trial court did not err in failing to

determine whether quantity of drugs was reasonably foreseeable to defendant

where defendant personally participated in transaction involving more than five

kilograms of cocaine).

---

[11]  To the extent the government contends Mr. Morales was "directly involved" in more than five kilograms of cocaine under U.S.S.G. § 1B1.3(a)(1)(A) simply by virtue of his involvement in money laundering (s*ee* Ape's brief at 46), we find this contention to be without merit.  Comment. 2 to U.S.S.G § 1B1.3(a) provides that a defendant is accountable under § 1B1.3(a)(1)(A) for "quantities of [controlled substances] with which he was directly involved."  Commentary to sentencing guidelines is authoritative unless it violates the Constitution or a federal statute or is inconsistent with the guideline which it seeks to explain or is a plainly erroneous reading of the guideline itself. *Stinson v. United States*, 508 U.S. 36 (1993).  Here, we find comment. 2 to U.S.S.G. § 1B1.3(a) to be consistent with the statute it interprets.   Based upon the plain language of this commentary, we do not believe a defendant's mere involvement in money laundering is sufficient to enable a district court to conclude the defendant was directly involved with a quantity of controlled substances.  The government has failed to provide the court with any authority to the contrary.

In *United States v. Chalarca*, 95 F.3d 239, 240 (2d Cir. 1996), a jury convicted the defendant of conspiracy to distribute and possess with intent to distribute cocaine. Although the defendant was present with his co-defendant at the scene of an attempted drug transaction involving $70,000.00 and 12 kilograms of cocaine, the district court determined the defendant was not directly involved in the drug transaction. *Chalarca*, 95 F.3d at 240-41. Accordingly, the court found the mandatory minimum sentence of ten years imprisonment under 21 U.S.C. § 841(b)(1)(A) was not applicable to the defendant. *Id.* at 242.

On appeal, the Second Circuit determined the district court's findings of fact were not clearly erroneous.

> Because the involvement of Chalarca was not direct, ... and because Chalarca was not aware that the purpose of his trip to the scene was to purchase cocaine, ... and because he did not constructively possess drugs or actually possess them ..., he cannot be sentenced under [21 U.S.S.G. § 1B1.3(a)(1)(A)] for criminal activity personally undertaken.

*Id.* at 244. The court also determined the defendant's "mere presence at the scene" was insufficient to establish that any particular quantity of cocaine was reasonably foreseeable to the defendant. *Id.* at 245. Consequently, the Second Circuit affirmed the defendant's sentence. *Id.* at 245-46.

Here, unlike *Chalarca*, there is no evidence Mr. Morales was ever present

-35-

at the scene of any illicit drug transaction. The government's evidence at trial simply established Mr. Morales was involved in the Aguirre organization as a money launderer. The government does not even argue it presented any evidence tending to show Mr. Morales was personally involved in the sale or distribution of drugs. Consequently, the district court did not err in failing to determine Mr. Morales was directly involved in the distribution of at least five kilograms of cocaine.

The government also claims the district court erred in determining no quantity of drugs was reasonably foreseeable to Mr. Morales. The government contends the district court should have held Mr. Morales responsible for the amount of cocaine that generated the drug profits Mr. Morales laundered. In other words, the government asserts the court should have converted the total amount of money Mr. Morales laundered ($831,514.37) into its value in cocaine to determine the quantity of drugs reasonably foreseeable to Mr. Morales.

Although the record may have permitted the district court to have undertaken such a conversion, we do not believe the trial court was obligated to do so. Rather, we believe the record supports the court's finding that no quantity of drugs was reasonably foreseeable to Mr. Morales. As stated, the record

indicates Mr. Morales was simply a money launderer. Unlike *Chalarca*, where the court also determined no quantity of drugs was reasonably foreseeable to the defendant, there is no evidence Mr. Morales was present at the scene of any drug transaction. In fact, the government does not even allege Mr. Morales had any knowledge of the occurrence of a single drug transaction. In light of the Supreme Court's admonition that "it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence," *Koon*, 116 S. Ct. at 2046 (internal quotation marks omitted), we conclude the district court's determination that no quantity of drugs was reasonably foreseeable to Mr. Morales was not clearly erroneous.

Because the district court did not err in determining Mr. Morales was not directly involved in the distribution of cocaine and no quantity of cocaine was reasonably foreseeable to Mr. Morales, the district court's decision to sentence Mr. Morales pursuant to the money laundering guidelines was proper and in accordance with law.

## IV. CONCLUSION

Based on the foregoing reasons, we hereby **AFFIRM** the convictions of Mr. Morales in all respects.